IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| DIGIMEDIA TECH, LLC,<br><br>        Plaintiff,<br><br>  v.<br><br>BEST BUY CO., INC., BEST BUY STORES, L.P.,<br>BESTBUY.COM, LLC, BEST BUY HEALTH, INC.,<br>and BEST BUY TEXAS.COM, LLC,<br><br>        Defendants. | CIVIL ACTION<br><br>NO. 2:23-cv-00530<br><br>**Jury Trial Demanded** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff DigiMedia Tech, LLC ("Plaintiff") files this Complaint for Patent Infringement and states as follows:

## THE PARTIES

1.    Plaintiff is a limited liability company organized and existing under the laws of the State of Georgia, having its principal office at 44 Milton Ave., Suite 254, Alpharetta, GA 30009.

2.    On information and belief, Defendant Best Buy Co., Inc. is a company organized and existing under the laws of Minnesota, with a principal place of business at 7601 Penn Ave. S., Richfield, MN 55423.

3.    On information and belief, Defendant Best Buy Stores, L.P. is a limited partnership organized and existing under the laws of Virginia with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

4.      On information and belief, Defendant BestBuy.com, LLC is a corporation organized and existing under the laws of Virginia with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

5.      On information and belief, Defendant Best Buy Health, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

6.      On information and belief, Defendant Best Buy Texas.com, LLC is a corporation organized and existing under the laws of Virginia with its principal place of business at 7601 Penn Ave South, Richfield, MN 55423.

7.      On information and belief, Defendants operate as a unitary business and are jointly and severally liable for the acts of patent infringement alleged herein. For example, products ordered on bestbuy.com can be selected for pickup at Best Buy stores. As a further example, Best Buy Health's website states that "[a]bout 75% of the population is located within 15 minutes of our stores," referring to Best Buy store locations. Exhibit I. On information and belief, Defendants operate places of business in this judicial district, including 2800 N Central Expy, Plano, TX 75074; 5299 Eldorado Pkwy, Frisco, TX 75033; 3333 Preston Rd Suite 200, Frisco, TX 75034; 1751 N Central Expy STE C, McKinney, TX 75070; 5514 S Broadway Ave, Tyler, TX 75703; 5885 Eastex Fwy, Beaumont, TX 77706; and 4210 St Michael Dr, Texarkana, TX 75503. Defendants are collectively referred to herein as "Best Buy."

## JURISDICTION AND VENUE

8.      This Court has exclusive subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1338(a) on the grounds that this action arises under the Patent Laws of the United States, 35 U.S.C. § 1 et seq., including, without limitation, 35 U.S.C. §§ 271, 281, 284, and 285.

9.      This Court has personal jurisdiction over Defendants, consistent with due process. Defendants are registered to do business in the State of Texas. Defendants also have places of business in the State of Texas and this judicial district. Further, Defendants have purposefully availed themselves of the privileges of conducting business in the State of Texas, including through the sale and offer for sale of the accused products and/or services throughout the State of Texas and this judicial district.

10.      Venue is proper in this Court as to Defendants pursuant to 28 U.S.C. § 1400(b) on the grounds that Defendants have a regular and established place of business and have committed acts of infringement in this judicial district.

## FACTUAL BACKGROUND

### The '980 Patent

11.      Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 8,160,980 entitled "Information System Based On Time, Space And Relevance" ("the '980 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

12.      A true and correct copy of the '980 patent is attached hereto as Exhibit A. The '980 patent is incorporated herein by reference.

13.      The application that became the '980 patent was filed on July 11, 2008.

14.      The '980 patent issued on April 17, 2012, after a full and fair examination by the USPTO.

15.      The '980 patent is and is legally presumed to be valid, enforceable, and directed to patent-eligible subject matter.

16.      The elements recited in the claims of the '980 patent were not well-understood, routine, or conventional when the application that became the '980 patent was filed. This is

evidenced by the fact that the Patent Examiner allowed the claims of the '980 patent over the art of record.

17.    The claims of the '980 patent are directed to technical solutions to the technical problems of both (i) reducing the wait time between requesting common, everyday information and displaying such information to a user and (ii) intelligently generating suggested content for the user from the potentially extensive information based on a user profile. *See* Declaration of David B. Lett, pp. 17-18 (attached hereto as Exhibit A-1). The claimed invention consists of a new concept, function, and format of delivery that provides a level of ease in accessing common information that prior art systems could not provide, including by providing a proxy that handles the collection and parsing of data, a server that gathers usage data from the client, a data mining cluster that allows for user profiling and time, space and relevance analysis, and a set of channels which are periodically updated and upon which automatic suggestions are given based on the user profile. *Id.*

18.    Specifically, for example, claims 5, 7, 8, 9, and 10 of the '980 patent claim:

5. An information system, said information system comprising: at least one client that displays information related to a plurality of information channels; a data mining cluster which performs user profiling and time, space and relevance analysis, wherein suggestions are provided to said at least one client based on a user profile and said time, space, and relevance analysis, and wherein said plurality of information channels are updated based on said suggestions.

7. The system according to claim 5, wherein said at least one client comprises a proxy that collects and parses data.

8. The system according to claim 5, wherein said plurality of information channels are periodically updated.

9. The system according to claim 5, wherein said suggestions are automatically provided to said at least one client.

10. The system according to claim 7, wherein the data collected by the proxy is in extensible markup language (XML) format.

19.     The system of asserted claim 5 provides a technical solution to the technical problem of quickly and efficiently providing common information to users. Lett Dec. at pp. 17-18. For example, in one embodiment the "system relies on a local client and a proxy, which can be fully located on the client itself, or rather on a separate server. *Id*. Basic data such as weather forecasts, temperature, news etc. can be displayed to the user. *Id*. By the user's choice of display, a profile can be constructed which suggests to the user alternative channels that match the user's profile but not the user's current selection" ('980 patent 1:60-67); Lett Dec. at p.18.

20.     Dependent claim 7 adds the technical limitation that the at least one client comprises a proxy that collects and parses data.

21.     Dependent claim 8 adds the technical limitation that the plurality of information channels are periodically updated.

22.     Dependent claim 9 adds the technical limitation that suggestions are automatically provided to the at least one client.

23.     Dependent Claim 10 adds the technical limitation that the data collected by the proxy be in extensible markup language (XML) format.

24.     The specification of the '980 patent goes on to explain:

> The system is a quality of life solution developed in view of residential housing complexes, for supplying information based on time, space and relevance therein. The system is made up of several interdependent subsystems, the client and the supporting infrastructure. The client includes a user-friendly interface and a proxy. The user interface is based in a touch screen placed inside the home to provide quick and easy access to a range of services including the information listed in the former paragraph, and also other functions such as digital photo frame. The proxy pre-fetches information for rapid access. The information provided to the user is based on the user's location and profile. Information is based in channels catalogued in a directory with levels of information and related-location. The usage of the system determines the suggestion of new services to the user.

The supporting infrastructure involves a database collecting information related to the users' usage of the system, a web portal for system administration, and a statistics analyzer to study the information and perform channel suggestions for each user. Additionally, the server can also pre-fetch client information, allowing thin clients with reduced processing power to be used within the proposed system. The database allows analysis of users' usage and to perform profiles leading to suggesting information channels that best fit their profiles.

A portal for system administration is also included allowing the addition, modification or removal of services to/from the system, along with system related parameters, emergency contacts, and location-based events relevant to the user.

The proxy module requests extensible markup language (XML)-based services and converts the provided information to the system format. This allows for seamless integration of different content providers for different information channels. The proxy also registers users' preferences, performs updates of the application and sends statistics to the database. In case of thin clients, the content can be pre-fetched into a server module, named a Content Server, and afterwards requested by the thin client.

The content within the proxy is time, location and user tagged. Information in the information channel is time tagged; the last information retrieved is the most relevant for the moment. When applied, the proxy is also able to fetch information within an information channel related to the client location. Configuration files are used to select the correct parameters to select relevant information within the XML-based service.

Besides XML-based information, the system is also able to fetch and navigate within maps to visualize location based content. The location-based content appears through the usage of a collection of layers that the user can select based in his or her interests.

The system also incorporates automatic updates to seamlessly integrate new functionalities during the course of the system life cycle. Periodically, the proxy checks the web administration portal for updates and system-related information according to the functionalities integrated within the system.

Statistics are collected within the user interface and sent to the proxy. By this tiered process, the system guarantees that statistical information is not lost due to network failure.

The proxy also integrates contacts, to-do lists and calendar functionalities.

For different processing loads, the proxy may reside entirely on the client, or run partially on a server.

The client has a hierarchical way to access information through different depths of information also reflected in Catalogue Directory stored within the Web Administration Portal. In the first information level, the user can find, for example access to information, services, SOS and Maintenance functionalities. SOS allows for fast access to emergency contacts, and maintenance allows for system customization, namely related location, approval of system services suggestions, themes customization, user identification and screensaver parameters.

Location based information is customized through introduction of the user's location-based reference, namely a landline phone number, a zip code or selection of district, municipality and parish. Moreover, when the screensaver is customized, the system automatically updates media content that will be shown, through the usage of personalized media content service. Upon user's approval of new information channels to be added to the client, the interface is automatically updated to incorporate the suggestions.

For statistical usage, each interaction between the user and the interface is reported to the proxy as an event.

The architecture of the user also uses XML to seamlessly configure the interface and supply relevant information within the interface. This allows for a fast modification of the interface when messages within the platform need to be accommodated.

The Database stores statistics (active/inactive clients, services unavailability, errors, etc).

The database stores users' registrations.

The Web Administration Portal enables addition, modification and removal of new services to be fetched by the proxy and incorporated within the user's interface.

By default, a set of services is integrated within the interface. Afterwards, based in the user's usage of the system further suggestions are performed by the system to the client and submitted for his or her approval.

Emergency contacts and relevant events are also inserted within the Web Administration Portal in order to be fetched by the proxy and shown within the user interface.

Administration statistics are also visualized within the web administration portal.

In the Web Administration Portal, along with the addition, modification and removal of services, the administrator is also able to catalogue each service in a directory, named Catalogue Directory, with levels of information, information related time, user's reference and location-related information. The Catalogue Directory is used within the Statistics Analyzer to suggest the information channels that best fit the user's profile.

Events performed by the user and stored within the database are analyzed. After analysis, new service suggestions for each user are made and stored within the database for future proxy retrieval.

The process by which the user profile is built and suggestions are made is hereinafter described:

The organization of information in each information channel ("channel") shall be executed based on Interaction Time in each information level. Most used items shall be displayed in greater focus, causing the remaining items to be in lesser focus.

E.g., if Economy News are the most accessed in the News Channel then such item will appear in greater focus than the Neighborhood News, as well as the remainder.

The update of the channel disposition shall be done by a content server when the application is updated.

In the Intelligent Suggestions Channel there are suggestions of content according to the user's profile. The user's profile is defined based on every click of the user in the channels.

The Intelligent Suggestions Channel is defined by the following process:

1—Previous Information Cataloguing

All information related to the user, channels and associated hyperlinks is categorized in a hierarchical way.

The user have access to several categories or associated category hierarchy. Geography is a good example. E.g. a user in "Lisbon", shall implicitly be under "Portugal", which on its hand is under "Europe".

The categorization of the channels and associated hyperlinks can be exemplified again by the News Channel. The user can click on "News" and then click on one of the sub-level, which for example can include "Economics" and "International".

Categorization shall also employ time variables, such as the day of the week on which the click occurred (1-7), if it is a working day, weekend or holiday. It will also employ the date on which the click took place, decomposing the date in the categories "year", "month", "day", "hour" and "minute".

2—User Profile Definition

The user profile is obtained resorting to Data Mining Clustering Techniques applied to the interaction records and their categories. Clustering is the partitioning of a data set into subsets (clusters), so that the data in each subset is similar within a parameterized distance. Each cluster that is obtained shall stand for a user profile.

As an example, consider a list of records from 3 users whose identifiers (ID) are 174, 175 and 176. The first record in FIG. 4 is from user 175 and was recorded at Jan. 1, 2007 at 10:12 in the path "News"→"Economics"→"Microeconomics". This hierarchy is represented by the columns "Pag. Level 1"=1="News", "Pag. Level 2"=2="Economics", and "Pag. Level 3"=1="Microeconomics".

The geographic location of the user is represented in a hierarchical way by "User Space 1"="Africa", "User Space 2"="Angola", "User Space 3"="Luanda". When possible, the information in the channel the user accessed is also geographically categorized; in this example it is done by "Content Space 1"="Africa", "Content Space 2"="Angola", "Content Space 3"="Luanda".

3—Intelligent Suggestions Channel

After defining the Cluster (profile) to which the user belongs, the channels to be suggested to the user are determined by analysis of all the "Pag. Level" categories and Interaction Time.

For each channel path in the cluster a sequence of probabilities is defined in regard to the user being likely to go full depth on a path or not. This allows for a prediction of the probability of the user following a determined hyperlink.

The set of paths for final hyperlinks in a cluster can be represented via a hypergraph. Each cluster record being a hyperedge of the hypergraph. A

hypergraph H=(V,E) is a set of vertexes V and a set of hyperedges E, representing a graph extension in which each edge can connect to more than two vertexes.

For example, if {p1="News", p2="Economics", p3 "Microeconomics"} is a record in the cluster, then the hypergraph will include the hyperedge which connects p1 to p2 and p3. Next, a determined weight will be linked to each hyperedge, calculated from the Page Levels probability, and weighted with Interaction Time.

Finally, to determine the suggestion to be submitted to the user, first the cluster to which the user belongs is identified and then the hyperlink (hyperedge) with the greatest relevance (weight) is suggested. If this hyperlink was already one of the most visited by the user, then the next most relevant hyperlink is selected until it is not one of the most relevant to the user.

Suppose that the bold records in FIG. 4 form a cluster. In order to determine the weights, we first calculate the probability of each hyperedge in the cluster and then multiply it by the average of its interaction times, as presented in FIG. 5.

The hyperedge with higher weight is the suggestion to the user.

In this example, the hyperlink suggested to the user is 2-3-1.

The specific element that determines geo-referenced information may vary from provider to provider. For instance, a good implementation can be achieved through zone codes in some areas. The method by which location is provided can vary.

The exemplary embodiments of the present invention, including the processes described above, can be written as computer programs and can be implemented in general-use digital computers that execute the programs using a computer readable recording medium and other types of transmission media. Examples of the computer readable recording medium include magnetic storage media (e.g., ROM, floppy disks, hard disks, etc.), and optical recording media (e.g., CD-ROMs, or DVDs). Other types of transmission media can include carrier waves (e.g., transmission through the Internet).

The foregoing embodiments are merely exemplary and are not to be construed as limiting the present invention. The present teaching can be readily applied to other types of apparatuses.

'980 patent, 2:30-5:59.

25.    Figure 4 of the '980 patent, described in the passage above, shows:

| Year | Month | Day | Hour | Minutes | UserId | Pag. Level 1 | Pag. Level 2 | Pag. Level 3 | Interaction Time | User Space 1 | User Space 2 | User Space 3 | Content Space 1 | Content Space 2 | Content Space 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 1 | 1 | 10 | 12 | 175 | 1 | 2 | 1 | 1 | Africa | Angola | Luanda | Africa | Angola | Luanda |
| 2007 | 1 | 1 | 15 | 10 | 176 | 1 | 2 | 3 | 2 | Europe | England | London | Europe | England | London |
| 2007 | 1 | 2 | 16 | 0 | 174 | 2 | 0 | 0 | 1 | Europe | Portugal | Lisbon | Europe | Portugal | Lisbon |
| 2007 | 3 | 10 | 11 | 5 | 176 | 2 | 3 | 0 | 1 | Europe | England | London | | | |
| 2007 | 3 | 10 | 16 | 50 | 174 | 2 | 3 | 1 | 3 | Europe | Portugal | Lisbon | Europe | Portugal | Lisbon |
| 2007 | 2 | 15 | 20 | 41 | 176 | 2 | 3 | 1 | 2 | Africa | Angola | Luanda | | | |
| 2007 | 3 | 10 | 12 | 15 | 176 | 2 | 3 | 1 | 2 | Europe | Portugal | Lisbon | Europe | England | London |
| 2007 | 4 | 5 | 13 | 10 | 175 | 2 | 3 | 3 | 3 | Europe | Portugal | Porto | | | |
| 2007 | 4 | 10 | 12 | 8 | 176 | 2 | 3 | 3 | 1 | Europe | Portugal | Lisbon | | | |
| 2007 | 3 | 10 | 17 | 15 | 174 | 2 | 3 | 4 | 2 | Europe | Portugal | Lisbon | Europe | Portugal | Lisbon |
| 2007 | 3 | 10 | 17 | 20 | 174 | 2 | 3 | 5 | 3 | Europe | Portugal | Lisbon | | | |
| 2007 | 4 | 6 | 13 | 12 | 175 | 3 | 3 | 2 | 1 | Europe | England | London | Europe | England | London |

Figure 4

26.    Figure 5 of the '980 patent, described in the passage above, shows:

| Pag. Level 1 | Pag. Level 2 | Pag. Level 3 | Probability | average interaction time | Weight |
|---|---|---|---|---|---|
| 2 | 3 | 0 | 10% | 1 | 10% |
| 2 | 3 | 1 | 30% | 2.33 | 70% |
| 3 | 3 | 2 | 1% | 1 | 1% |
| 2 | 3 | 3 | 20% | 2 | 40% |
| 2 | 3 | 4 | 10% | 2 | 20% |
| 2 | 3 | 5 | 10% | 3 | 30% |

Figure 5

27.    This combination of functional components and limitations set forth in the asserted claims constitutes patent-eligible subject matter, are not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more technical, inventive concepts for accomplishing the goal of quickly and efficiently providing common information to users without unnecessary delay, and providing suggested additional information based on a user's profile. Lett Dec., p. 17-18.

28.    The combination of functional components and limitations set forth in the asserted claims of the '980 patent was not well-understood, routine, or conventional at the time of the invention. Lett Dec., p.18-19. This is also evidenced by the decision by the Patent Examiner to allow the asserted claims over the art of record.

29.    DigiMedia's technical expert, David B. Lett, has opined that, based on his education, training, and experience, the '980 patent is directed to patent-eligible subject matter under the U.S. Supreme Court's *Alice* framework. Declaration of David B. Lett, pp. 17-23.

30.    With regard to step one of the *Alice* analysis, in Mr. Lett's expert opinion,

the claims of the '980 Patent in their entirety, the character of these claims as a whole is not directed to excluded subject matter, such as an abstract idea. While the claims might be dissected to identify individual abstract ideas within them, I understand that such dissection is improper. Here, the claims are directed to an improvement in the functioning of prior art computer systems that uses a proxy and a data mining cluster, both of which are specifically described in detail in the '980 Patent's written description. Moreover, it is my expert opinion that, even if, for the sake of argument, the claims are considered to involve patent-ineligible concepts like abstract ideas, the claims as a whole do not attempt to monopolize the entirety of any patent ineligible concept.

Importantly, the patent examiner did not identify any patent eligibility issues during the prosecution of the '980 Patent. Instead, the examiner merely required that the claims be rewritten to include certain elements from certain proposed claims and noted that the prior art of record "neither anticipated nor rendered obvious" those elements. The patentee satisfied the examiner by amending the claims to include the data mining cluster element in all independent claims. The patent issued with no issues whatsoever raised about the eligibility of the claims under Section 101.

… The claims of the '980 Patent all specifically require a data mining cluster, a claim element that was added to all the independent claims in response to the examiner's office action and that the examiner found was not anticipated or rendered obvious by the prior art of record. This data mining cluster is described at length in the patent, and for example in claim 1 allows for user profiling and time, space and relevance analysis. By implementing the data mining cluster as specifically described in the patent, the claims of the '980 Patent do, in fact, articulate a specific technological improvement in the provision of information to a user. This is a technical solution to a technical problem, and the patent is not merely a "do-it-on-a-computer" patent.

As a result, it is my opinion that the claims, considered as a whole and in light of the specification and file history, are not directed to an abstract idea, but rather are directed to a specific sequence of steps and specifically identified and described components that improve the functionality of a specific type of computer system. Thus, it is my opinion that the claims of

the '980 Patent satisfy Alice step one and are not directed to any excluded subject matter.

Lett Dec. pp. 19-21.

31.    Moving to step two of the *Alice* analysis, Mr. Lett opined that

Even if the claims of the '980 Patent could be considered to be directed to patent-ineligible subject matter, it is my opinion that the claims would nonetheless remain patentable because analyzing the elements of the claims individually *and* as an ordered combination shows that the claims form an inventive concept that amounts in practice to more than a patent on any ineligible concept itself. Specifically, the inventive concept embodied in the '980 Patent's claims is more than the mere application of an abstract idea using well-understood, routine, and conventional activities.

The file history of the '980 Patent proves this point. The examiner expressly found that the elements added to the originally rejected claims were not anticipated or rendered obvious by the prior art of record. In my opinion, if claim elements are not anticipated or rendered obvious by the prior art, they cannot be well understood, routine, or conventional.

Moreover, the examiner's determination that the claims as amended and issued were patentable indicates that the claims included unconventional steps. It is my opinion that the claims as a whole do, in fact, include unconventional steps in an ordered combination that confine the claims to a particular, useful application of any potentially ineligible concept, and improve prior computer technology.

Further, even if the claims of the '980 Patent are considered to include known, conventional elements, reading the claims as a whole and read in light of the specification and file history, the claims involve the non-conventional and non-generic arrangement of known conventional elements.

[The New York Court's] Order asserts that the patent does not explain how the claimed improvements to a user's experience are a product of any particular technological innovation. Order at 22. Again, I must respectfully disagree with the Court's Order. First, I understand that the accused infringer must establish patent ineligibility by clear and convincing evidence, and it appears the Court did not apply that burden of proof in its analysis. Second, the '980 Patent does, in fact, explain to a skilled artisan how the claimed invention accomplishes the benefits to the user experience. This description can be found in the specification's description of the claimed data mining cluster and proxy elements outlined above. The Order appears to have been confused by the fact that the programs

13

implementing the claimed invention can be run on general purpose computers. However, computer programs constitute the embodiments of the claimed invention, not the general purpose computer components on which the embodying programs run. See '980 Patent 5:45-49.

For the foregoing reasons, it is my opinion that the claims of the '980 Patent satisfy step two of the Alice analytical framework for determining patent eligibility, and form an inventive concept that amounts in practice to more than a patent on any ineligible concept itself.

Lett Dec., pp. 19-23.

32.     The expert opinions of Mr. Lett, which are hereby incorporated herein by reference and attached hereto as Exhibit A-1, establish the patentability of the '980 patent as a factual matter. At a minimum, Mr. Lett's expert declaration creates an issue of fact concerning step two of the *Alice* framework by showing, as a factual matter, that the claims of the '980 patent contain an inventive concept that amounts in practice to more than a patent on any ineligible concept.

33.     In addition, the significance of the inventiveness of the '980 patent is illustrated by the fact that it has been cited in 11 other patent applications, including the following U.S. patents and published patent applications: US8488011B2, US8493353B2, US9064326B1, US9430876B1, US10341459B2, US8539369B2, US9501140B2, and US20140164404A1. These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the inventions claimed and disclosed in the '980 patent were not well-understood, routine, or conventional at the time of the invention.

***The '287 Patent***

34.     Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,606,287 entitled "Method and Apparatus for Compression Rate Selection" ("the '287 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

35.    A true and correct copy of the '287 patent is attached hereto as Exhibit B. The '287 patent is incorporated herein by reference.

36.    The application that became the '287 patent was filed on November 29, 2000.

37.    The '287 patent issued on August 12, 2003, after a full and fair examination by the USPTO.

38.    The '287 patent is and is legally presumed to be valid, enforceable, and directed to patent-eligible subject matter.

39.    The elements recited in the asserted claims of the '287 patent were not well-understood, routine, or conventional when the application that became the '287 patent was filed.

40.    The '287 patent observes that various forms of entertainment devices have appeal to users, and that many users "prefer to use all of these modes of entertainment from time to time." '287 patent at 1:27-31. The '287 patent goes on to note that this not only requires a lot of space, but because "a plurality of users in a household each desire to enjoy one or more of these modes of entertainment simultaneously and in disparate locations," many people have more than one of various types of devices. *Id*. at 1:39-53.

41.    The '287 patent observes that "[m]edia signals are frequently compressed. '287 patent at 2:10. It also contains a section titled "Limitations of Prior Art," in which the '287 patent disparages the state of the prior art: "Prior art solutions require a user to select a compression rate before the media signal is recorded. However, the maximum compression rate achievable without unacceptable loss of media signal quality, termed the 'optimal compression rate,' varies. Thus, users frequently select sub-optimal compression rates. If a user selects a lower compression rate than the optimal compression rate, more storage space is used to store the media signal than is required. Additionally, if a user selects a higher compression rate than the

optimal compression rate, the signal quality of the stored media signal is unacceptable." '287 patent at 2:10-26.

42.     The claims of the '287 patent are directed to technical solutions to the technical problem of video compression rate selection, for example, in the field of home electronic entertainment with multiple types of media devices, including cellular phones. One of the reasons this is important is the rate selection for video compression should reduce the stored file size or bandwidth requirements while maintaining high quality for the video. The media devices can operate in a networked manner and share the compressed video over the network. Higher video compression rates reduce network bandwidth or file storage requirements, but also reduce video quality. The selection of an optimal or preferred video compression rate that maintains sufficient quality for sharing video over the network calls for technical solutions. The '287 patent discloses and claims such technical solutions. For example, the '287 patent recognized that multiple data items can be associated with the video input, and a maximum compression rate can be determined from the data items. The video can be compressed at the maximum compression rate and stored. The media device can operate as client in a client/server architecture for storing the compressed video. This approach overcomes problems for video compression rates that result in either larger file sizes than necessary or unacceptable video quality. Consequently, the technology in the '287 patent enables networked media devices such as cellular phones to compress video at sufficient quality for storing in a network with bandwidth and storage limitations.

43.     The sequence of steps set forth in the asserted claims of the '287 patent provide a technical solution to the technical problem of determining a video compression rate for media devices to store video in a communications network.

44.    Specifically, by reciting the following steps, asserted claim 1 of the '287 patent is directed to a technological solution to a technological problem as disclosed in the '287 patent:

> 1. A method for recording a media signal comprising:
>
> generating one or more data items wherein said data items are associated with said media signal;
>
> determining a maximum compression rate from said data items wherein recording said media signal compressed at said maximum compression rate does not result in an unacceptable loss of quality of said media signal;
>
> compressing said media signal at said maximum rate into a compressed media signal; and
>
> storing said compressed media signal, wherein said step of determining is performed at a client in a client/server architecture.

45.    The claimed sequence of steps set forth in the '287 patent constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for accomplishing the goal of accurate and automated information exchange. Claim 1 does not merely claim a result. Rather, in keeping with the nature of method claims, claim 1 recites steps. Those steps do not merely claim the technical benefit (or results) of the inventions disclosed in the '287 patent. Rather, claim 1 recites steps that, if performed, will result in those technical benefits. For example, the steps recited in claim 1, if performed, will improve at least the following issue with the state of the art described in the '287 patent: "Prior art solutions require a user to select a compression rate before the media signal is recorded. However, the maximum compression rate achievable without unacceptable loss of media signal quality, termed the 'optimal compression rate,' varies. Thus, users frequently select sub-optimal compression rates. If a user selects a lower compression rate than the optimal compression rate, more storage space is used to store the media signal than is

required. Additionally, if a user selects a higher compression rate than the optimal compression rate, the signal quality of the stored media signal is unacceptable." '287 patent at 2:10-26.

46.    Moreover, the specification of the '287 patent contains a great deal of additional detail regarding preferred embodiments for practicing the claimed invention. '287 patent at 3:1-7:8. In particular, the '287 patent includes a section titled "Compression Rate Selection," in which it identifies preferred techniques for selecting a maximum compression rate.

47.    This claimed sequence was not well-understood, routine, or conventional at the time of the invention. This is evidenced by the fact that the inventors of the '287 patent submitted sworn declarations, subject to penalty for willful false statements, that they "believe we are the inventors of the subject matter which is claimed and for which a patent is sought."

48.    That the invention recited in claim 1 of the '287 patent was not well-understood, routine, or conventional at the time the '287 patent was filed is also evidenced by the Examiner's actions in the prosecution of the '287 patent.

49.    The Examiner who examined the '287 patent (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

50.    The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

51.     The Examiner who examined the '287 patent rejected the claims of the application, making rejections over U.S. Patent No. 6,339,568; U.S. Patent No. 6,243,139; and U.S. Patent No. 6,310,848. However, the Examiner indicated that application claim 6 would be allowable if rewritten in independent form. The applicants then submitted an amendment amending claim 6 to place it in independent form. The Examiner then allowed the claim and it issued as claim 1 of the '287 patent.

52.     The Examiner allowed claim 1 of the '287 patent after a full and fair investigation. Had the Examiner determined, after his review of the art of record and his knowledge of the state of the art, that the subject matter recited in claim 1 was well-understood, routine, or conventional at the time of the invention, he would not have allowed the claim to issue.

53.     The significance of the inventiveness of the '287 patent is illustrated by the fact that it or a family member has been cited in 13 other patent applications, including the following patents and published patent applications: US20030204519A1; US20050117475A1; US20060095657A1; US20060112138A1; US20110145447A1; US9570103B2; US8867904B2; US7295753B2; WO2004021695A1; US7474832B2; WO2004107756A1; US7508609B2; and JP2008154132A.

*The '476 Patent*

54.     Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 7,715,476, entitled "System, Method and Article of Manufacture for Tracking a Head of a Camera-Generated Image of a Person" ("the '476 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

55.    A true and correct copy of the '476 patent is attached hereto as Exhibit C. The '476 patent is incorporated herein by reference.

56.    The application that became the '476 patent was filed on April 21, 2005.

57.    The '476 patent claims priority to an application filed on July 30, 1999.

58.    The '476 patent issued on May 11, 2010, after a full and fair examination by the USPTO.

59.    The '476 patent is and is legally presumed to be valid, enforceable and directed to patent-eligible subject matter.

60.    The elements recited in the asserted claims of the '476 patent were not well-understood, routine, or conventional when the application that became the '476 patent was filed.

61.    The '476 patent states that "[t]he present invention relates to displaying video images generated by a camera on a display, and more particularly to tracking a head portion of a person image in camera-generated video images." '476 patent at 1:41-44. The '476 patent observes that it is important to track a head portion of the user image since this specific body part is often the focus of the most attention. '476 patent at 1:63-65.

62.    The '476 patent identifies a problem in the state of the art as it existed at the time of filing: "Many difficulties arise, however, during the process of identifying the current position of the head portion of the user image. It is often very difficult to discern the head portion when relying on a single technique. For example, when identifying the location of a head portion using shape, color, motion etc., portions of the background image and the remaining body parts of the user image may be confused with the head. For example, a flesh coloring of a hand may be mistaken for features of the head." '476 patent at 1:65-2:7.

63.    The claims of the '476 patent are directed to technical solutions to the technical

problem of how to identify a head in an image, and in particular a solution to the problem in the

state of the art identified by the '476 patent. One of various reasons this is important is to assist

in focusing a digital camera. Since many camera users are not trained in how to properly focus a

camera, and because many photographs are candid shots of moving subjects, the problem calls

for technical solutions. The '476 patent discloses and claims such technical solutions.

64.    For example, the '476 patent recognized that while a number of different

techniques could be used to identify a head portion of a subject in an image, no single technique

is foolproof. Thus, the '476 patent discloses applying at least two techniques to identify a head

portion and basing the detection of heads on the results of the two techniques. This approach

overcomes a problem that any particular technique may be fooled by or rendered inapplicable by

particular circumstances (e.g., lighting conditions, orientation of the subject to the camera, etc.).

*See, e.g.,* '476 patent at 5:36-53 ("The first confidence value and the second confidence value

may then be made available for use by various applications in operation **204**. Such applications

may decide whether the head portion of the person image has moved based on the confidence

values. Logic such as an AND operation, an OR operation, or any other more sophisticated logic

may be employed to decide whether the results of the first head tracking operation and/or the

second head tracking operation are indicative of true head movement. For example, if at least

one of the head tracking operations indicates a high confidence of head movement, it may be

decided to assume that the head has moved. On the other hand, if both head tracking operations

indicate a medium confidence of movement, it may be assumed with similar certainty that the

head has moved. If it is decided to assume that the head has moved, an interaction may be shown

between the video images generated by the camera and the virtual computer-generated environment."); *see also* '476 patent at 6:66-7:7.

65.     For example, asserted claim 13 (which depends from and incorporates the elements of claim 1) of the '476 patent claims:

> 1. A method performed by a computer for processing images to identify a head portion of a subject in the images comprising:
>
> obtaining images of a subject;
>
> generating, by the computer, a first confidence value representing a confidence that a first process has identified a location of a head portion of the subject in the images;
>
> generating, by the computer, a second confidence value representing a confidence that a second, different process has identified the location of the head portion of the subject in the images; and
>
> identifying, by the computer, the location of the head portion of the subject in the images based at least in part on the first confidence value and the second confidence value.
>
> 13. A method as recited in claim 1, wherein the first process includes identifying a point of separation between the head portion and a torso portion.

66.     The sequence of steps set forth in asserted claim 13 of the '476 patent provides a technical solution to the technical problem of head portion focus. Claim 13 does not merely claim a result. Rather, in keeping with the nature of method claims, claim 13 recites steps. Those steps do not merely claim the technical benefit (or results) of the inventions disclosed in the '476 patent. Rather, claim 13 recites steps that, if performed, will result in those technical benefits. For example, claim 13 recites steps that, if performed, will address at least the following issue with the state of the art identified in the '476 patent: "Many difficulties arise, however, during the process of identifying the current position of the head portion of the user image. It is often very difficult to discern the head portion when relying on a single technique. For example, when

identifying the location of a head portion using shape, color, motion etc., portions of the background image and the remaining body parts of the user image may be confused with the head. For example, a flesh coloring of a hand may be mistaken for features of the head." '476 patent at 1:65-2:7.

67. Moreover, the specification of the '476 patent contains a great deal of additional detail regarding preferred embodiments for practicing the claimed invention. '476 patent at 4:56-11:9, including preferred embodiments of processes for identifying head portions in images.

68. Other claims of the '476 patent recite additional features that provide further technological benefits. For example, claim 5 of the '476 patent recites "wherein the first process includes analyzing pixels within a search window, wherein the search window is created based on a previously identified head portion." As an additional example, claim 11 recites "wherein the first process includes generating a mass distribution, wherein local maxima of the mass distribution are used to identify a person image." As a further example, claim 12 recites "wherein the first process includes generating a mass distribution, wherein local maxima of the mass distribution in the context of a previously identified person image are used to identify a person image."

69. The claimed sequence of steps set forth in the '476 patent constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for focusing a digital camera.

70. This claimed sequence was not well-understood, routine, or conventional at the time of the invention. This is evidenced by the fact that the inventors of the '476 patent submitted sworn declarations, subject to penalty for willful false statements, that "I believe that I

am . . . an original, first and joint inventor . . . of the subject matter which is claimed and for which a patent is sought on the invention."

71.     That the invention recited in claims 5, 11, 12, and 13 of the '476 patent were not well-understood, routine, or conventional at the time the '476 patent was filed is also evidenced by the Examiner's actions in the prosecution of the '476 patent.

72.     The Examiner who examined the '476 patent (1) read and understood the invention set forth in the specification; (2) determined whether the application was adequate to define the metes and bounds of the claimed invention; (3) determined the scope of the claims; (4) searched existing technology for the inventions recited in the claims of the application; and (5) determined the patentability of the claims.

73.     The Examiner performed these duties in his role as "advocate/protector of [the] public interest with respect to intellectual property," which involves a "cooperative investigation between the Examiner and the Applicant, which ensures an Applicant receives a patent only for that which they are entitled to in accordance with Patent laws." *Id.* at 8-9.

74.     The Examiner initially rejected application claims 1-33 under 35 U.S.C. § 101. The applicants overcame these rejections by addressing the Examiner's concerns regarding § 101. The applicants also overcame other rejections by the Examiner over the art of record, prompting the Examiner to allow claims 5, 11, 12, and 13 of the '476 patent (among others).

75.     The Examiner allowed claims 5, 11, 12, and 13 of the '476 patent after a full and fair investigation. Had the Examiner determined, after his review of the art of record and his knowledge of the state of the art, that the subject matter recited in claims 5, 11, 12, and 13 was well-understood, routine, or conventional at the time of the invention, he would not have allowed the claims to issue.

76.     The significance of the inventiveness of the '476 patent is illustrated by the fact that it or a family member has been cited in 157 other patent applications, including the following patents and published patent applications: JP4157234B2; US8711217B2; US8564661B2; US9892606B2; US20050162515A1; US7020305B2; US20020085738A1; US7424175B2; US8457401B2; US20020171742A1; US6870945B2; US8300042B2; US7259747B2; US8035612B2; US6968085B2; US20030107650A1; US7710391B2; US7161579B2; US8947347B2; US7623115B2; US8797260B2; US7102615B2; US7646372B2; US7883415B2; US7760248B2; US7803050B2; US8570378B2; US9393487B2; US8686939B2; US7854655B2; US9474968B2; US8313380B2; US8139793B2; US7627139B2; US8233642B2; US7850526B2; US8160269B2; US9174119B2; US7918733B2; US9682319B2; US7134080B2; JP4240957B2; JP4318465B2; WO2004055776A1; US9177387B2; US7505862B2; US8072470B2; US8498452B2; US8593542B2; US7565030B2; US7440593B1; US8989453B2; US8155397B2; US8330831B2; US7574016B2; US9692964B2; US8948468B2; US9129381B2; US8896725B2; US7792970B2; US7269292B2; US8494286B2; US7471846B2; US7844076B2; US7620218B2; US8682097B2; US20070223732A1; US9573056B2; US8287373B2; US7874917B2; US8323106B2; US10279254B2; WO2005041579A2; CN1902930B; US7663689B2; US8345918B2; GB2414615A; US8547401B2; US8320641B2; US7386150B2; US8503800B2; US7315631B1; US9128519B1; JP4654773B2; US8081822B1; US7796780B2; US8098277B1; US20070133940A1; US8265392B2; US8265349B2; US8150155B2; KR100660725B1; US20110014981A1; AT497218T; WO2008017051A2; US7403643B2; US7916897B2; US8310656B2; US8781151B2; USRE48417E1; AU2006252252B2; US8055067B2; US8300890B1; WO2008104549A2; WO2008107002A1; US20080232696A1; US20080252596A1; JP2008282085A; US7916971B2; US8702430B2; US8221290B2;

US8360904B2; KR100904846B1; WO2009035705A1; US8159682B2; US8542907B2;

WO2009094646A2; CN103258184B; US8340379B2; US8259163B2; US8368753B2;

US7855737B2; US8595218B2; US20090312629A1; JP5547730B2; US8961313B2;

US11464578B2; US8690776B2; US8641621B2; US8554307B2; US8527657B2;

US8342963B2; US8393964B2; US8142288B2; US8379917B2; US8787663B2; US9582707B2;

US9100574B2; US8670816B2; JP6222795B2; US10314559B2; US10347100B2;

US9901406B2; US10188467B2; US10853625B2; US10551913B2; WO2016181469A1;

JP6566028B2; US9949700B2; US9675319B1; US10278778B2; US11259879B2;

US10469590B2; US11484365B2; US11037316B2; US11205274B2; and JP6973258B2.

77.    These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the invention claimed and disclosed in the '476 patent was not well-understood, routine, or conventional at the time of the invention.

**The '220 Patent**

78.    Plaintiff is the owner by assignment of all right, title, and interest in and to United States Patent No. 6,684,220 entitled "Method and System for Automatic Information Exchange" ("the '220 patent"), including the right to sue for all past, present, and future infringement, which assignment was duly recorded in the USPTO.

79.    A true and correct copy of the '220 patent is attached hereto as Exhibit D. The '220 patent is incorporated herein by reference.

80.    The application that became the '220 patent was filed on September 20, 2000.

81.    The '220 patent issued on January 27, 2004, after a full and fair examination by the USPTO.

82.     The '220 patent is and is legally presumed to be valid, enforceable and directed to patent eligible subject matter.

83.     The elements recited in the asserted claims of the '220 patent were not well-understood, routine, or conventional when the application that became the '220 patent was filed. This is demonstrated, for example, by the decision of the Patent Examiner to allow the claims of the '220 patent over the art of record.

84.     The claims the '220 patent are directed to technical solutions to the technical problem of a server system conducting automated information exchanges. One of the reasons this is important is to support automated and accurate server-generated responses to customer inquiries in online chat systems. With accurate and automated information exchange, routine customer inquiries can be answered directly by a server system. The '220 patent discloses and claims such technical solutions for automated information exchange. For example, the '220 patent couples an information source to a processor that stores a data model. The '220 patent discloses a loading engine for automatically creating object links between input variables and output variables for the data objects in the data model. Consequently, the technology in the '220 patent enables automated and accurate online responses from a server system to customer support inquiries without requiring answers from customer support representatives.

85.     For example, asserted claim 10 of the '220 patent claims:

10. A method for automatic information exchange, comprising:

retrieving a model from an information source, the model having a plurality of objects, each of the plurality of objects having an input variable and an output variable;

automatically identifying the input variables and the output variables of each of the plurality of objects; and

automatically creating object links between the corresponding input variables and output variables of each of the plurality of objects.

86. The sequence of steps set forth in the asserted claim of the '220 patent provide a technical solution to the technical problem of a server system conducting automated information.

87. The claimed sequence of steps set forth in the '220 patent constitutes patent-eligible subject matter, is not directed to an abstract idea, law of nature, or natural phenomenon, and contains one or more inventive concepts for accomplishing the goal of accurate and automated information exchange.

88. The significance of the inventiveness of the '220 patent is illustrated by the fact that it has been cited in six other patent applications, including the following U.S. patents and published patent applications: US20060010423A1, US20060010419A1, US20060136497A1, EP1674953A1, and US20140373034A1. These public documents and their related prosecution histories are incorporated herein by reference and provide concrete proof that the inventions claimed and disclosed in the '220 patent were not well-understood, routine, or conventional at the time of the invention.

## COUNT I – INFRINGEMENT OF THE '980 PATENT

89. Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

90. Best Buy has been and now is making, using, selling, offering for sale, and/or importing products that incorporate one or more of the inventions claimed in the '980 patent.

91. Best Buy directly infringes one or more claims of the '980 patent.

92. For example, Best Buy infringes at least claims 5 and 7-9 of the '980 patent, either literally or under the doctrine of equivalents, in connection with Best Buy's Insignia TVs with "What to Watch" and similar products, as detailed in the preliminary claim chart attached hereto as Exhibit E and incorporated herein by reference.

93.    Moreover, after receiving notice of the '980 patent and its infringement thereof no later than the service of this complaint, on information and belief, Best Buy continues to induce third-parties (e.g., retailers and end users) to directly infringe the '980 patent, including, for example, by distributing the above-referenced products and encouraging others to sell those products or use them in a way known to infringe when used in their customary and intended manner as set forth in Exhibit E.

94.    Best Buy's infringing activities are and have been without authority or license under the '980 patent.

95.    Plaintiff is entitled to recover damages for Best Buy's infringement, which damages cannot be less than a reasonable royalty.

## COUNT II – INFRINGEMENT OF THE '287 PATENT

96.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

97.    Best Buy has directly infringed one or more claims of the '287 patent. Best Buy has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '287 patent.

98.    For example, Best Buy has infringed at least claim 1 of the '287 patent, either literally or under the doctrine of equivalents, in connection with Best Buy's Jitterbug Smart2 and similar products, as detailed in the preliminary claim chart attached hereto as Exhibit F and incorporated herein by reference.

99.    On information and belief, Best Buy performed all steps of this claim or, alternatively, to the extent a user performed any step, Best Buy conditioned the user's use of the functionality of Best Buy's accused instrumentalities described herein on the performance of that step as disclosed in Exhibit F. The accused functionality relates to the video storage functionality

and the corresponding hardware of the accused products (e.g., Best Buy's Jitterbug Smart2), including specifically its use of MPEG-4 Advanced Video Coding in backing up videos, as set forth in Exhibit F. For example, on information and belief, a user could not use the functionality of the accused instrumentalities as described in Exhibit F without performance of the steps recited in claim 1 of the '287 patent. Best Buy also controlled the manner and/or timing of the functionality described in Exhibit F. In other words, for a user to utilize and obtain the benefit of the functionality described in Exhibit F, the steps of claim 1 of the '287 patent had to be performed in the manner described in Exhibit F. Otherwise, Best Buy's backup storage of videos described in Exhibit F (and the corresponding benefit) would not have been available to users.

100.    Because the asserted claim of the '287 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply to it. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

101.    Best Buy's infringing activities have been without authority or license under the '287 patent.

102.    Plaintiff has been damaged by Best Buy's infringement of the '287 patent, and Plaintiff is entitled to recover damages for Best Buy's infringement, which damages cannot be less than a reasonable royalty.

**COUNT III – INFRINGEMENT OF THE '476 PATENT**

103.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

104.    Best Buy has directly infringed one or more claims of the '476 patent. Best Buy has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '476 patent.

105.    For example, Best Buy has infringed at least claim 13 of the '476 patent, either literally or under the doctrine of equivalents, in connection with its Jitterbug Smart2 and similar products, as detailed in the preliminary claim chart attached hereto as Exhibit G and incorporated herein by reference.

106.    Moreover, on information and belief, Best Buy has performed all steps of this claim or, alternatively, to the extent a user performed any step, Best Buy conditioned the user's use of the functionality of Best Buy's accused instrumentalities described herein on the performance of that step as disclosed in Exhibit G. The accused functionality relates to the head-tracking functionality and corresponding hardware of the accused products (e.g., Best Buy's Jitterbug Smart2), as set forth in Exhibit G. For example, on information and belief, a user could not use the functionality of the accused instrumentality as described in Exhibit G without performance of the steps recited in claim 13 of the '476 patent. Best Buy also controlled the manner and/or timing of the functionality described in Exhibit G. In other words, for a user to utilize the functionality described in Exhibit G, the steps of claim 13 of the '476 patent had to be performed in the manner described in Exhibit G. Otherwise, the head-tracking functionality of Best Buy's accused instrumentalities (and the corresponding benefit) would not have been available to users.

107.    Because the asserted claims of the '476 patent are method claims, the marking requirement of 35 U.S.C. § 287 does not apply to them. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

108.    Best Buy's infringing activities have been without authority or license under the '476 patent.

109.    Plaintiff has been damaged by Best Buy's infringement of the '476 patent, and Plaintiff is entitled to recover damages for Best Buy's infringement, which damages cannot be less than a reasonable royalty.

## COUNT IV – INFRINGEMENT OF THE '220 PATENT

110.    Plaintiff realleges and incorporates by reference the allegations set forth above, as if set forth verbatim herein.

111.    Best Buy has made, used, sold, offered for sale, and/or imported products that incorporate one or more of the inventions claimed in the '220 patent.

112.    For example, Best Buy has infringed at least claim 10 of the '220 patent, either literally or under the doctrine of equivalents, in connection with Best Buy's chatbot system, as detailed in the preliminary claim chart attached hereto as Exhibit H and incorporated herein by reference.

113.    Because the asserted claim of the '220 patent is a method claim, the marking requirement of 35 U.S.C. § 287 does not apply to it. Therefore, Plaintiff has complied with all applicable requirements of § 287 such that it is entitled to past damages for infringement.

114.    Best Buy's infringing activities have been without authority or license under the '220 patent.

115.    Plaintiff has been damaged by Best Buy's infringement of the '220 patent, and Plaintiff is entitled to recover damages for Best Buy's infringement, which damages cannot be less than a reasonable royalty.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

## **PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court find in its favor and against Best Buy, and that the Court grant Plaintiff the following relief:

A.    Entry of judgment that Best Buy has infringed one or more claims of the '980 patent,

B.    Entry of judgment that Best Buy has infringed one or more claims of the '287 patent,

C.    Entry of judgment that Best Buy has infringed one or more claims of the '476 patent,

D.    Entry of judgment that Best Buy has infringed one or more claims of the '220 patent,

E.    Damages in an amount to be determined at trial for Best Buy's infringement, which amount cannot be less than a reasonable royalty, and an accounting of all infringing acts, including but not limited to those acts not presented at trial,

F.    A determination that this case is exceptional, and an award of attorney's fees,

G.    All costs of this action,

H.    Pre-judgment and post-judgment interest on the damages assessed, and

I.    Such other and further relief, both at law and in equity, to which Plaintiff may be entitled and which the Court deems just and proper.

This 18th day of November, 2023.

*/s/ Cortney S. Alexander*
Cortney S. Alexander
  cortneyalexander@kentrisley.com
  Tel: (404) 855-3867
  Fax: (770) 462-3299
KENT & RISLEY LLC

5755 N Point Pkwy Ste 57
Alpharetta, GA 30022

Attorneys for Plaintiff